IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TONYA M. ALEXANDROWSKI, | ) | Case No. 3:20-cv-2302 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION[1]** |

Plaintiff, Tonya M. Alexandrowski, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under title XVI of the Social Security Act.  Alexandrowski suffers from spinal, neurological, and mental health impairments stemming from a workplace injury in which she was run over by a forklift.  She challenges the Administrative Law Judge's ("ALJ") negative findings, contending the ALJ misevaluated the opinion evidence, disregarded evidence supporting a finding of disability, and posed a hypothetical to the vocational expert ("VE") that did not accurately portray her functional limitations.  But because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Alexandrowski's application for SSI be AFFIRMED.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

## I.    Procedural History

On February 1, 2017, Alexandrowski applied for SSI.  (Tr. 272).[2]  Alexandrowski alleged

that she became disabled on July 23, 2014, due to "1. Colitis, 2. Back damage due to work

injury, [and] PTSD."  (Tr. 272, 290).  The Social Security Administration denied

Alexandrowski's application initially and upon reconsideration.  (Tr. 164-81, 183-97).

Alexandrowski requested an administrative hearing.  (Tr. 216).

ALJ Richard Horowitz heard Alexandrowski's case on January 25, 2019, at which

Alexandrowski moved to amend the alleged onset date to January 25, 2017.  (Tr. 37-97); *see* (Tr.

46).  The ALJ denied the claim in a March 6, 2019 decision.  (Tr. 18-30).  In doing so, the ALJ

determined that Alexandrowski had the residual functional capacity ("RFC") to perform light

work, except that:

> [Alexandrowski] can occasionally use right and left hand and foot controls.  She
> can reach overhead with both arms occasionally, and reach in all other directions
> with both arms frequently, and can handle, finger, and feel with both hands
> frequently.  She can occasionally climb ramps and stairs, never climb ladders,
> ropes, or scaffolds, and can occasionally balance and stoop, and never kneel,
> crouch, or crawl.  In addition, she can never work around hazards, such as at
> unprotected heights, or around moving mechanical parts, can never operate a
> commercial motor vehicle, and can never work in conditions of humidity and
> wetness, in extreme heat or cold, in conditions where there are concentrated
> vibrations, and in conditions where there is concentrated exposure to dust, odors,
> fumes, or other pulmonary irritants.  She is also limited to performing simple,
> routine and repetitive tasks, but not at a production rate pace, for example, no
> assembly line or conveyor belt work; she is limited to simple work-related
> decisions, and she can respond appropriately to occasional interaction with
> supervisors and coworkers, but with no team or tandem work with coworkers, and
> no interaction with the general public.  Finally, she is limited to tolerating few
> changes in the work setting, defined as routine job duties that remain static and
> are performed in a stable, predicable work setting.  Any necessary changes need
> to occur infrequently, and be adequately and easily explained.  Instructions
> regarding new tasks must be provided verbally or with a short demonstration
> rather than in writing.

---

[2] The administrative transcript appears in ECF Doc. 14.

(Tr. 24).

Based on VE expert testimony that an individual with her age, experience, and RFC could work in such representative occupations as a mail clerk, merchandise marker, and office helper, the ALJ determined that Alexandrowski wasn't disabled because she could perform a significant number of jobs in the national economy.  (Tr. 29-30).  On August 12, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On October 12, 2020, Alexandrowski filed this action to obtain judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Alexandrowski was born on June 9, 1971, and she was 43 years old on the alleged onset date.  (Tr. 164, 272).  Her highest grade of school completed was 10th grade in 1990.  (Tr. 25, 49, 291, 616, 838).  She had past work as a farm worker, machine tender, waitress, and assistant manager, which the ALJ determined she couldn't perform.  (Tr. 28, 50-54, 85, 291)

### B.    Relevant Medical Evidence

#### 1.    Physical Impairments

On July 23, 2014, Alexandrowski was admitted to the emergency room after being hit in the mid thoracic area by a "tow motor."  (Tr. 552, 561).  She reported back and knee pain, tingling and numbness in her legs, dizziness, and lightheadedness.  (Tr. 553, 561).  Her physical examination results, however, were normal.  (Tr. 555-58).

An x-ray of Alexandrowski's chest showed calcification adjacent to the left humeral head that could reflect calcific rotator cuff tendinopathy or bursitis versus superimposed soft tissue calcification.  (Tr. 563).  An x-ray of her spine showed no fracture or misalignment, but it also

showed spondylosis and degenerative disc disease at C6-7 and mild facet joint osteoarthritis. (Tr. 564). A CT scan of Alexandrowski's thoracic spine showed no fracture or malalignment but noted mild multilevel spondylosis and dependent atelectasis in portions of the lung. (Tr. 565). A CT scan of the lumbar spine showed no acute fracture or malalignment, but it also noted tiny osteophytes indicating minimal spondylosis and a small disc bulge at L4-5. (Tr. 567). A CT scan of her head showed no acute intracranial abnormality. (Tr. 566).

Alexandrowski's attending physician at the hospital, David Green, MD, diagnosed Alexandrowski with thoracic back contusion and discharged her the same day she was admitted with instructions that she "[r]eturn to work after approval by occ[upational] health." (Tr. 560, 562). On the cover sheet for Alexandrowski's emergency room visit records, there were special instructions for her back pain: "No strenuous physical activity at this time; Gradually increase activity as tolerated; Follow up with occupational health about 5 days; May return to ER for any symptoms of concern." (Tr. 551).

On August 4, 2014, Alexandrowski presented to Edward Randolph Handyside, MD, for a worker's compensation visit. (Tr. 119, 365). Alexandrowski reported continued mild/moderate pain in her mid-back and upper neck area that was worsened by turning her neck. *Id.* She also reported fear associated with the workplace since her accident. *Id.* Upon examination, Alexandrowski had normal results, except for tenderness in the mid thoracic and upper cervical areas. (Tr. 119-20, 365-66). Dr. Handyside diagnosed Alexandrowski with back contusion and cervical strain, put in place a work restriction to lifting no more than ten pounds, referred her to physical therapy, and prescribed Flexeril and Motrin. (Tr. 120, 366, 370).

On August 14, 2014, Alexandrowski returned to Dr. Handyside, reporting continued left upper back and neck pain with radiation to the left arm, no improvement with medication, and

4

her workplace was not adhering to the work restriction.  (Tr. 124, 361).  Upon examination, Alexandrowski had limited neck range of motion to the left side and pain to palpation in the left paracervical and thoracic areas.  (Tr. 123, 361).  Dr. Handyside assessed Alexandrowski with cervical radiculopathy, stopped Flexeril, prescribed a Medrol dose pack and tramadol, and continued her work restrictions.  (Tr. 124, 361-62).

On August 20, 2014, Alexandrowski began physical therapy.  (Tr. 358).  She reported upper extremity tingling into her hands, pain to light touch and pressure from her mid-back to her neck, muscle spasms in her mid-neck that sometimes radiated into her lower back, mild headaches since her accident that increased throughout the day, difficulty turning her head and lifting her arms overhead, and difficulty sleeping.  *Id.*  Alexandrowski rated her pain as 7/10 and reported that her medications made her ill and she had a history of ulcerative colitis.  *Id.*  Upon examination, Alexandrowski had tender thoracic paraspinal muscles, moderate spasms in the left upper trapezius, 25% reduction in cervical flexion and extension, 75% reduction in left cervical rotation and 25% reduction to the right, 3+/5 cervical strength with pain and 4-/5 scapular stabilizer strength, and pain with cervical compression.  *Id.*  She had normal upper extremity range of motion, but she fatigued quickly with arms over her head.  *Id.*  The attending physical therapist noted Alexandrowski had "very guarded" upper trunk movement and significant muscle spasm and tightness, and her pain and tightness limited her range of motion and strength.  *Id.*

Alexandrowski continued physical therapy until September 22, 2014.  (Tr. 353-54, 360, 414-18, 424-31, 438-47).  At her last visit, she reported no improvement in her neck pain, continued difficulty turning her head to the left, and weakness and tingling with the left hand. (Tr. 418).  The attending physical therapist assessed her with 50% decrease in left cervical

rotation, 7/10, and left upper extremity weakness and tingling, recommending further medical testing. *Id.*

Meanwhile, on September 10, 2014, Alexandrowski admitted herself to the hospital with cervical radiculopathy but, according to the medical record, the visit was cancelled without indication that treatment was provided. (Tr. 540-41); *see* (Tr. 540-44).

On September 11, 2014, Alexandrowski returned to Dr. Handyside, reporting continued pain extending from her mid-back to the occipital region of her scalp and very mild improvement with physical therapy. (Tr. 420). She also reported pain upon forward/backward flexion of the neck, worsening pain upon lifting, and occasional pain radiating to her hands. *Id.* Upon examination, Alexandrowski had normal results, except pain to palpation of the paraspinal areas and an agitated appearance. (Tr. 420-21). Dr. Handyside assessed Alexandrowski with "Myalgias back, neck region." (Tr. 421). Given the lack of improvement with physical therapy, lack of objective evidence, and the inability of the worker's compensation program to approve pain management, Dr. Handyside recommended she follow up with another provider, stop tramadol, start over-the-counter analgesics, and maintain a restriction of lifting no more than ten pounds secondary to continued pain. *Id.*

On August 31, 2015, Alexandrowski presented to Losey Thomas, MD, with left foot pain and swelling. (Tr. 135). Upon examination, she had a bony tenderness in her left foot, and Dr. Thomas diagnosed Alexandrowski with acute gout and prescribed colchicine and indomethacin. *Id*.

On February 18, 2016, Alexandrowski visited Warren C. Morris, MD, to establish care for her back pain, reporting pain that radiated to her legs and caused headaches, an inability to lie on her back at night, and some positive results from 800 mg ibuprofen and hot water baths. (Tr.

537).  She also reported chronic diarrhea and heartburn, stating she had a colonoscopy in 2013 that revealed infectious colitis.[3]  *Id.*

On March 22, 2016, Alexandrowski visited Jeffrey L. Justice, MD, for a colonoscopy. (Tr. 469).  Alexandrowski reported generalized abdominal pain and a two-year history of bloody diarrhea.  *Id.*  A review of symptoms was positive for limitation of musculoskeletal motion and back pain.  *Id.*  The colonoscopy was performed on March 29, 2016, with normal results except some mild hyperemia of the sigmoid colon and rectum.  (Tr. 477).  Biopsies were submitted to rule out mild ulcerative colitis, the results of which showed collagenous colitis and prominent lymphoid aggregate.  (Tr. 477, 492).

On April 12, 2016, Alexandrowski, upon referral from Dr. Justice, visited Mark H. Leifer, MD, for an evaluation of her gastrointestinal problems.  (Tr. 599).  Alexandrowski reported that she'd had diarrhea problems since her workplace accident, sometimes needing to go every half hour on a daily basis.  *Id.*  She also reported mid to lower abdominal pain (bloating and burning) that was worsened by eating.  *Id.*  Upon examination, Alexandrowski had mild diffuse tenderness in the periumbilical region.  (Tr. 600).  Dr. Leifer diagnosed her with collagenous colitis and reflux, prescribed Imodium, and ordered an EGD.  *Id.*  Dr. Leifer noted that Alexandrowski's symptoms suggested the possibility of diarrhea-predominant irritable bowel syndrome.  (Tr. 601).  Alexandrowski underwent an EGD on April 13, 2016, the results of which were normal.  (Tr. 602, 605-07).

On June 21, 2016, Alexandrowski returned to Dr. Leifer for a follow up.  (Tr. 602).  She reported some improvement, going from bowel movements every 20 minutes and all night to 50 bowel movements per day and only 3-4 times per night.  *Id.*  She continued to report burning and

---

[3] The record did not include the portions of this treatment note containing Dr. Morris's physical examination, diagnoses, and treatment plan.

bloating in the abdomen. *Id.* Dr. Leifer assessed her with collagenous colitis, increased Imodium, prescribed Pepto-Bismol, and recommended weight loss. (Tr. 603). Dr. Leifer noted, however, that he was suspicious collagenous colitis was the primary problem, given her primary symptoms seemed to be diarrhea. *Id.*

On February 21, 2017, Alexandrowski went to the hospital, reporting exacerbation of her chronic back pain (10/10) with numbness/tingling in her hands and lower extremities. (Tr. 400-01). Upon examination, Alexandrowski had normal results except "diffused midline thoracic spine." (Tr. 401). She was discharged in a stable state with Norco and encouraged to see a pain management provider. (Tr. 401-02).

On February 22, 2017, Alexandrowski returned to the hospital with back pain and underwent x-ray and MRI examinations. (Tr. 626-36). X-rays of her spine showed no acute abnormality. (Tr. 634-36). X-rays of her cervical spine showed, however, mild chronic degenerative disc disease at C5-6 that had not changed since her July 23, 2014 x-ray. (Tr. 634). MRI scans showed mild degenerative disc disease and spondylosis at C5-C6 and C6-C7, a small protrusion at T7-8 that had not changed since July 23, 2014, remodeling of the ventral cord contour, and degenerative changes at L4-L5. (Tr. 627-31).

On March 8, 2017, Alexandrowski visited the University of Toledo Medical Center and was seen by A Ovitt, MCN CNP. (Tr. 684-87). She reported pain that had been worsening for the previous three to four months that worsened with walking or sitting. (Tr. 685). A review of symptoms was positive for colitis, muscle aches and weakness, arthralgias, back pain, swelling in the extremities, numbness, frequent/severe headaches, and migraines. *Id.* Upon examination, Alexandrowski had tender paraspinal muscles, limited cervical spinal range of motion, 4- and 4/5 upper and lower extremity strength due to back pain, diminished reflex, and decreased sensation

in her arms and hands. (Tr. 685-86). Her lumbar spine was tender, had limited flexion and rotation, was too painful to extend. (Tr. 686). Nurse Practitioner Ovitt assessed Alexandrowski with degeneration of cervical, lumbar, and thoracic interverbal discs and lumbar radiculopathy, referred Alexandrowski to physical therapy, ordered an EMG to evaluate nerve root compression visible in her MRI, and prescribed meloxicam. *Id.* On March 13, 2017, Alexandrowski underwent an EMG. (Tr. 681). The EMG results were abnormal, tending to support chronic L5 radiculopathy in the left upper extremity. (Tr. 683).

On April 19, 2017 Alexandrowski returned to Nurse Practitioner Ovitt, reporting that physical therapy had not been helping, she was told her hips were not even, and she did not get much relief from medication. (Tr. 678-79). Her physical examination results were the same as her March 8, 2017 results. (Tr. 680). Nurse Practitioner Ovitt assessed Alexandrowski with lumbar radiculopathy and degeneration of cervical, lumbar, and thoracic discs. *Id.* Nurse Practitioner Ovitt prescribed gabapentin, replaced cyclobenzaprine with methocarbamol, and referred Alexandrowski to aquatic therapy. *Id.* In describing the EMG results, Nurse Practitioner Ovitt stated: "Discussed with patient that since the radiculopathy is long standing it is not likely to improve, even if the nerve is decompressed." *Id.*

On May 31, 2017, Alexandrowski presented to Nurse Practitioner Ovitt, reporting that aquatic therapy was denied by her insurance and the new medication didn't help. (Tr. 676). Her physical examination results were the same as the previous two visits. (Tr. 676-77). Nurse Practitioner Ovitt reviewed imaging tests with Daniel Guadin, PhD, who did not recommend surgery at the time. (Tr. 677). Nurse Practitioner Ovitt re-referred Alexandrowski to aquatic therapy. *Id.*

On December 4, 2017, Alexandrowski visited Lara Wynne, NP, to establish care.  (Tr. 931).  Alexandrowski reported chronic pain from her neck to her lumbar area with radiculopathy, she had not taken gabapentin in three months due to side effects of nausea and drowsiness, she slept only two hours at a time due to pain, and she used a muscle relaxer only sparingly because it upset her colitis.  *Id.*  She also stated she did not leave the house much because she was concerned her legs would go numb while driving and had trouble focusing.  *Id.*  A review of symptoms was positive for chest pain, leg swelling, abdominal pain and diarrhea, back pain, myalgias, and neck pain.  (Tr. 933).  Upon examination, Alexandrowski had normal results except spinal tenderness and extremity weakness, through "poor effort" was given.  (Tr. 933-34).  Nurse Practitioner Wynne assessed Alexandrowski with chronic midline back pain and radiculopathy, prescribed gabapentin, sertraline, and meloxicam, and referred her to neurosurgery.  (Tr. 934).

Alexandrowski attended physical therapy with David Brown, LPCC, from March 21, 2018, through July 30, 2018.  (Tr. 863-72).  Her symptom distress score decreased to 4/10 on June 13, 2018.  (Tr. 869).  But it increased to 6/10 on July 30, 2018.  (Tr. 871).

On April 17, 2018, Alexandrowski visited neurosurgeon James C. Dozier, MD, reporting headaches with no visual, hearing, or balance issues; neck pain, from which some of the headache "seems to [o]riginate;" numbness and pain radiating down both arms to all digits; midthoracic pain and lesser lumbar pain; and itchiness resulting from her leg pan.  (Tr. 886, 891).  A review of symptoms was positive for back pain, falling ("patient stumbles a lot"), myalgias, neck pain, itching, dizziness, tingling, sensory change, weakness in arms and legs, and headaches.  (Tr. 893).  Upon examination, Alexandrowski had normal results except for paraspinal tenderness.  (Tr. 894).  Dr. Dozier assessed Alexandrowski with whole body pain with

10

marked issues of thoracic and itching pain diffusely and ordered her previous thoracic and cervical MRIs and EMGs.  *Id.*

On July 6, 2018, Alexandrowski returned to Dr. Dozier, reporting continued significant low back pain, arm pain, and numbness/paresthesia.  (Tr. 902).  Her exam results were the same as her last visit.  (Tr. 904).  After review of her past MRIs, Dr. Dozier ordered an EMG scan.  *Id.*

On August 2, 2018, Alexandrowski reported to Dr. Dozier continued pain.  (Tr. 912).  Dr. Dozier noted that the EMG rendered negative results, stating "Diffuse pain not explained by spinal imaging.  *** I recommend Rheumatology eval and if not helpful, would consider getting a second opinion at one of the University Medical Centers."  (Tr. 914).

On December 13, 2018, Alexandrowski visited rheumatologist Hirenkumar P. Patel, MD.  (Tr. 160).  Alexandrowski reported chronic back, joint, and neck pain; pain affecting the hands, arms, and legs; numbness in the hands; occasional extremity swelling; and aggravation with activity.  *Id.*  Upon examination, Alexandrowski had tenderness in her hands, left elbow, shoulders, spine, and hips.  (Tr. 161).  Dr. Hirenkumar noted Alexandrowski had multiple myofascial tender points, suggesting "possibly fibromyalgia," for which further workup was necessary.  (Tr. 162).  He ordered several tests and referred Alexandrowski to pain management.  *Id.*

On January 15, 2019, Alexandrowski visited Lindsay R. Bradbee, DO, to discuss colitis and fibromyalgia.  (Tr. 944).  Alexandrowski reported that she ceased all medication one month before, after a bloody stool.  *Id.*  She reported pain "all over" and was very tender.  *Id.*  Physical examination results were normal.  (Tr. 947-48).  Dr. Bradbee diagnosed Alexandrowski with fibromyalgia, collagenous colitis, and chronic diarrhea and referred her to gastroenterology.  (Tr. 948).

11

### 2. Mental Health Impairments

On December 4, 2017, Nurse Practitioner Wynne diagnosed Alexandrowski with moderate episode of recurrent major depressive disorder, prescribed Zoloft, and referred her to psychiatry. (Tr. 934).

On January 2, 2018, Alexandrowski visited Dr. Bradbee for a follow up on her anxiety and depression, stating that she had to cancel a psychiatric evaluation and had not heard back. (Tr. 938, 941). Dr. Bradbee increased Zoloft and encouraged Alexandrowski to call back. (Tr. 941).

On February 8, 2018, Alexandrowski went for a mental health assessment and was seen by Craig Parliment, LSW. (Tr. 831, 842). Alexandrowski reported that she had been diagnosed with post-traumatic stress disorder ("PTSD") by Neil Shamberg, PhD, who had treated her for two months and passed away. (Tr. 831-32). Since her workplace accident, she: (1) had feelings of fear and helplessness; (2) had flashbacks and nightmares of the accident; (3) had markedly decreased interest in participating in significant events; (4) felt detached and estranged from others; (5) intermittently had a restricted range of affect; (6) had an exaggerated negative belief or expectations of self and others; (7) had persistent negative emotional states; (8) had difficulty falling and staying asleep, irritability, and occasional anger outbursts; (9) had difficulty concentrating, hypervigilance, and an exaggerated startle response; and (10) cried a lot. *Id.* Alexandrowski reported 9/10 distress and, in the past two weeks, depressed, sad, or irritable mood, loss of interest and isolation, sleep disturbance, feelings of tiredness, some difficulty focusing, hopelessness, worthlessness, guilt, and loss of appetite. (Tr. 831). She also had dyslexia, because of which she dropped out of school. (Tr. 838).

12

Upon examination, Alexandrowski had good hygiene/grooming, agitated motor activity, friendly attitude, good eye contact, normal speech, dysphoric and irritable mood, logical thought process, adequate attention and concentration, intact memory, partial insight, and good judgment. (Tr. 843-45).  Parliment diagnosed Alexandrowski with PTSD and unspecified depressive disorder and began individual therapy.  (Tr. 840, 845).

On May 10, 2018, Alexandrowski underwent a psychiatric evaluation and was seen by Tonya Edmondson, CNP.  (Tr. 847, 862).  She reported 6/10 depression severity, that was 5/10 on average, and increased stressors – worker's compensation and her children.  (Tr. 847)*.*  She continued with poor sleep due to nightmares and back pain.  *Id.*  She also reported irritability and crying when upset.  *Id.*  Her examination results were the same as her February 8, 2018 results. (Tr. 859-61).  Dr. Edmondson reaffirmed Alexandrowski's PTSD and unspecified depressive disorder diagnoses.  (Tr. 861).  Alexandrowski declined medication/somatic services and accepted individual therapy.  *Id*.

C.      **Relevant Opinion Evidence**

1.      **Physical Impairments**

a.      **Consultative Examiner – Timothy Wagner, MD**

On March 18, 2017, Timothy Wagner, MD, gave a consultative examination in connection with a state application for disability benefits.  (Tr. 665-69).  At the time, Alexandrowski reported generalized back pain, numbness and tingling in her face, arms, and legs, and weakness.  (Tr. 665).  Her symptoms were exacerbated by prolonged and repetitive activities and improved with ibuprofen.  *Id.*  Her pain was 6-8/10 on most days and 6/10 on examination.  *Id.*  Alexandrowski reported her pain caused difficulty with prolonged sitting, standing, walking, bending, and lifting.  *Id.*

Upon examination, Alexandrowski had 4+ strength throughout her extremities with sensation intact but subjectively diminished, though Dr. Wagner stated the muscle testing was "somewhat" unreliable because she was able to ambulate with ease, get up and off the exam table without issue, and her tingling and numbness in face and nondermatomal regions was inconsistent with her spinal pathology.  (Tr. 668).  Dr. Wagner also noted an inconsistency in the straight leg test, as she reported pain that was not consistent with radicular leg pain and reported no pain when the exam was conducted while she was distracted.  (Tr. 668-69).  Dr. Wagner stated Alexandrowski's effort was variable and often "not good," the resulting inconsistencies of which made it hard to discern how much pain she had.  (Tr. 669).

Dr. Wagner diagnosed Alexandrowski with low back pain with mild degenerative disease and possible disc herniations.  *Id.*  Although Alexandrowski claimed weakness, Dr. Wagner noted no muscle atrophy and that she remained ambulatory and well developed.  *Id.*  He opined that she could sit normally in an 8-hour workday with normal breaks; had mild limitations with standing and walking; had mild limitations with lifting and carrying weight; had no manipulative limitations; no visual, communicative, or environmental limitations; and could occasionally stoop, bend, crouch, and squat.  *Id.*

### b.    State Agency Consultants

On April 4, 2017, Leon D. Hughes, MD, evaluated Alexandrowski's physical capacity based on a review of the medical record and determined Alexandrowski had the physical RFC to perform medium work.  (Tr. 175-76, 180).  Dr. Hughes determined Alexandrowski could lift 50 pounds occasionally and 25 pounds frequently; stand/walk/sit 6 hours in an 8-hour workday; push/pull to the same degree she could lift/carry; climb ramps/stairs, crouch, crawl, and kneel frequently; climb ladders/ropes/scaffolds occasionally; and balance and stoop without limitation.

14

(Tr. 175-76).  On August 20, 2017, Steve E. McKee concurred with Dr. Hughes's assessment of Alexandrowski's physical capacity, except he additionally found she could occasionally lift 20 pounds and frequently lift 10 pounds and restricted her to light work.  (Tr. 191-92, 196).

### 2.    Mental Impairments

#### a.    Consultative Examiner – Neil S. Shamberg, PhD

On February 23, 2017, Dr. Shamberg conducted a psychological evaluation of Alexandrowski at the request of the Ohio Division of Disability Determination.  (Tr. 615). Alexandrowski reported that, because of her pain and numbness, she dropped things often and spent her days mostly sitting around, relying on her two adult sons and her boyfriend to do household chores, cooking, and cleaning.  (Tr. 617-19).  She didn't go out, was afraid of other people and crowded places, and did not socialize. (Tr. 618-19).  She had poor sleep due to nightmares and when depressed she lost her appetite and energy, crying all day.  (Tr. 618). Alexandrowski also reported short-term memory problems, forgetting where things were at home.  (Tr. 619).

Dr. Shamberg diagnosed Alexandrowski with: (1) major depressive disorder, recurrent, without psychotic features; (2) social anxiety disorder; (3) PTSD; (4) specific learning disorder, with impairment in reading; and (5) unspecified anxiety disorder.  (Tr. 620).  Dr. Shamberg opined that Alexandrowski had "severe significant limitations" with her ability to understand written instructions because of her dyslexia.  (Tr. 621).  She would also have "limitations" remembering and carrying out instructions because of her untreated depression and anxiety issues.  *Id.*  Dr. Shamberg opined that Alexandrowski would have "severe significant limitations" with focus, maintaining normal attention, keeping up pace, and persisting job tasks, given that she appeared in great pain and was depressed and tearful throughout the evaluation.  *Id.*

15

Dr. Shamberg further opined that Alexandrowski would have "very severe significant limitations" responding appropriately to social interactions (supervisors and coworkers) given her "obvious low average intelligence," anxiety problems, and major depression. (Tr. 622). Last, Dr. Shamberg opined that Alexandrowski would not "do well" in responding appropriately to work pressures in light of her depression, PTSD, and anxiety. *Id.*

#### b.  **Consultative Examiner – Daniel J. Kuna, PhD**

On April 5, 2018, Daniel J. Kuna, PhD, conducted a rehabilitation psychology evaluation in connection with Alexandrowski's workers' compensation claim. (Tr. 780). Alexandrowski reported that she cooked, did laundry, and cleaned. (Tr. 783). Dr. Kuna observed pain behaviors that decreased in frequency as the interview progressed. (Tr. 784). Alexandrowski reported crying spells four to five times per week and constant nervousness. *Id.* A written test was administered on March 13, 2018, at which Dr. Kuna observed no pain behaviors. (Tr. 785). Her score was determined to be invalid, given she scored higher that psychiatrically hospitalized patients. *Id.*

Upon a review of Alexandrowski's medical record, including Dr. Shamberg's opinion, objective testing, and a clinical interview, Dr. Kuna opined that Alexandrowski did not suffer any psychological disorder as a result of her workplace injury. (Tr. 786). Dr. Kuna noted that it was clear Alexandrowski was exaggerating her symptoms, including reporting 10/10 pain without concomitant behavioral display. (Tr. 785). Dr. Kuna further noted that Dr. Shamberg didn't have Alexandrowski's medical record, did not conduct psychological testing, and accepted Alexandrowski's report of her injury. *Id.*

16

### c.    State Agency Consultants

On March 4, 2017, Kathleen Malloy, PhD, evaluated Alexandrowski's mental capacity based on a review of the medical evidence.  (Tr. 176-79).  Dr. Malloy determined that Alexandrowski would be moderately impaired in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted, complete a workday/workweek without interruption, accept instructions and respond appropriately to criticism, get along with others without distracting them or exhibiting behavioral extremes, respond appropriately to workplace changes, travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently of others.  (Tr. 177-78).  Dr. Malloy further found that Alexandrowski was markedly limited in her ability to interact appropriately with the general public.  (Tr. 178).  On August 17, 2017, Courtney Zeune, PsyD, concurred with Dr. Mallow's assessment of Alexandrowski's mental limitations.  (Tr. 193-95).

### D.    Function Report

On February 28, 2017, Alexandrowski completed a function report, stating that she lived with her two adult sons and was limited in her ability to work by her back and neck pain, tingling and numbness, and headaches.  (Tr. 300).  Her day consisted of waking up and waiting for her medication to kick in, after which she would wash dishes.  (Tr. 301).  Because of her symptoms, she slept only two to three hours and she found it very difficult to dress.  *Id.*  She prepared food with help of her children and boyfriend, though her diet had changed since her colitis diagnosis. (Tr. 302).  She did laundry once a week and her family did other housework.  (Tr. 302-03).  She got around by walking and driving, she could go out alone, and she grocery shopped.  (Tr. 303).

17

She did not spend time with others or go places for social activities, though she did not claim having problems getting along with others.  (Tr. 304).

Alexandrowski stated she could not lift, reach, or twist because of numbness.  (Tr. 305). She could walk as far as the mailbox and pay attention as long as someone spoke.  *Id.*  She usually finished what she started, she followed written and spoken instructions "very well," she had "no problems" getting along with authority figures and had never been fired for problems getting along, and she is "good" with changes in routine.  (Tr. 305-06).  However, she had crying spells when depressed, which she was all the time.  (Tr. 306).

**E.     Relevant Testimonial Evidence**

At the ALJ hearing, Alexandrowski testified that her ability to work was impacted by pain all over her body, headaches, and itching, tingling, and burning sensation in her hands, which caused her to drop things.  (Tr. 56, 60).  Alexandrowski testified she had colitis, but she hadn't received treatment for it since January 2017.  (Tr. 57).  Her only treatment had been Dr. Bradbee refilling her medication.  (Tr. 58).  Her colitis would act up if she ate something she was not supposed eat, resulting in use of the bathroom every 30 minutes.  (Tr. 71).  Dr. Patel had stated to Alexandrowski her hand symptoms could be symptoms of fibromyalgia, for which she was taking Cymbalta, but she had not been on the medication long enough to see any effects. (Tr. 60-61).

Alexandrowski testified her pain symptoms caused her to be "super depressed" and anxious; she did not care to leave the house and the "beepers in the stores" exacerbated her anxiety.  (Tr. 61, 76).  She had received treatment for her depression by Dr. Shamberg after his consultative examination "off the record."  (Tr. 62-63).  Dr. Shamberg saw Alexandrowski once per week from March 2017 until his death in November 2017, but he didn't take notes.  (Tr. 64-

18

67).  Since then, she had seen another counselor and been prescribed Zoloft and Zypra.  (Tr. 61-62).  She only slept two to three hours, which caused her to be foggy the next day.  (Tr. 71).

Alexandrowski testified that she didn't know how far she could walk before stopping or how long she could stand before becoming uncomfortable.  (Tr. 67).  She didn't know if she could bend, squat, or crawl.  *Id.*  She couldn't sit "long" because her legs would fall asleep, and she'd feel an itching and tingling pain.  (Tr. 67, 69).  She also lacked strength to push and pull with her arms and didn't lift any weight at all.  (Tr. 67).  She could reach with her arms, but not without pain.  (Tr. 67).

Alexandrowski testified she no longer did laundry because she did not care.  (Tr. 73).  She was sometimes so exhausted from lack of sleep and in so much pain she would have her boyfriend help her dress.  (Tr. 74).  She received assistance from others to do household chores and most of her shopping.  (Tr. 68, 76).  She did not watch television for long because she'd lose interest.  (Tr. 74-75).  She spent most of the day sitting in a recliner with a heating pad.  (Tr. 69).  Alexandrowski testified she had trouble driving because she would lose feeling in her legs over time.  (Tr. 49).  In one instance, she unknowingly let go of the brake and the car drifted into an intersection.  (Tr. 75).

The ALJ next asked the VE to assume a hypothetical person who was limited to light work, except:

> [S]he can occasionally use right and left hand and foot controls; can reach overhead with both arms occasionally; reach in all other directions with both arms frequently; and can handle, finger[], and feel with both hands frequently; can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and can occasionally balance, stoop, kneel, crouch, or crawl; never work around hazards, such as at unprotected heights or around moving mechanical parts; never operate a commercial motor vehicle; can occasionally work in conditions of humidity and wetness, extreme heat or cold, conditions where there are concentrated vibrations and conditions where there's concentrated exposure to dust, odors, fumes, or other pulmonary irritants.  Also limited to performing

19

> simple, routine, and repetitive tasks but not at a production pace; for example, no assembly line or conveyor belt work; limited to simple work-related decisions; and can respond appropriately to occasional interaction with supervisors and coworkers with no team or tandem work with coworkers and no interaction with the general public and limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predicable work setting.  Any necessary changes need to occur infrequently and be adequately and easily explained.

(Tr. 84-85).  The VE testified such a person could work as a mailroom clerk, office helper, and merchandise marker.  (Tr. 86).  The VE testified further reductions to never being able to kneel, crouch, and crawl and to never be exposed to the stated environmental limitations would not affect his answer.  (Tr. 87).  The VE further testified that if the hypothetical were reduced to sedentary work, the individual could work as an address clerk, documents clerk, and account clerk, though the number of jobs for account clerk would need to be reduced by one third to account for no public interaction.  (Tr. 87-88).

## III.   Law & Analysis

### A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'"").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)).

### B.    Step Four: Weighing of the Opinion Evidence

Alexandrowski argues that the ALJ failed to apply proper legal standards in his evaluation of the opinion evidence.  ECF Doc. 18 at 21.  Specifically, she argues the ALJ failed to analyze Dr. Gaudin's "opinion" that Alexandrowski's radiculopathy was not likely to improve.  ECF Doc. 18 at 21-23.  Alexandrowski states, in passing, that the ALJ also ignored Dr. Green's special instruction that Alexandrowski not engage in strenuous physical activity and to gradually increase it over time.  ECF Doc. 18 at 23.  In a separate section of her brief, Alexandrowski also argues that the ALJ erred in refusing to grant weight to Dr. Shamberg's opinion on the basis that he treated Alexandrowski after issuing his opinion.  ECF Doc. 18 at 25-26.

The Commissioner responds that the ALJ did not err because Dr. Gaudin's statement in a treatment note was not a medical opinion, as it did not express any functional limitations or what Alexandrowski could do in spite of her radiculopathy.  ECF Doc. 19 at 3.  The Commissioner argues Dr. Green's special instruction was not sufficient to be considered a medical opinion

21

because it was limited to a five-day period, did not say what Alexandrowski could do in spite of her limitations, and was not particularly probative.  ECF doc. 19 at 4.  The Commissioner argues the ALJ did not err in his evaluation of Dr. Shamberg's opinion because Dr. Shamberg did not express any specific, quantifiable limitations, and Alexandrowski has not said what greater limitations were due on account of her mental impairments.  ECF Doc. 19 at 7.

In reply, Alexandrowski repeats her argument that the ALJ gave inadequate reasons for discounting Dr. Shamberg's opinion.  ECF Doc. 20 at 2.  She emphasizes Dr. Shamberg's finding of "severe significant limitation" in staying focused, maintaining normal attention, keeping up pace, persisting with job tasks, and responding appropriately to social interactions. *Id.* Alexandrowski argues Dr. Gaudin made an "explicit and well-founded medical opinion or conclusion that shatters the believability of the ALJ's approach."  ECF Doc. 20 at 4.

### 1.  Opinion Standard

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. § 416.927(c).[4]  An ALJ must give a treating source opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  If an ALJ does not give a treating source's opinion controlling weight, he must determine the weight it is due by considering the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  *See id.*; 20 C.F.R. § 416.927(c)(2)-(6).

---

[4] On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because Alexandrowski filed her application on February 1, 2017, I will apply the pre-March 27, 2017 regulations to the arguments she raises in this case.

### 2.    Dr. Gaudin and Dr. Green

I agree with the Commissioner that the portions of the medical record Alexandrowski cites are not medical opinions.  "A medical opinion must reflect 'judgments about the nature and severity of the claimant's impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions.'" *Fronczak v. Berryhill*, No. 16-11554, 2017 U.S. Dist. LEXIS 140870, at *17 (E.D. Mich. Aug. 7, 2017) (alterations omitted) (quoting 20 C.F.R. § 416.927(a)(1)).  A treatment note can qualify as a medical opinion if these criteria are met.  *Morabito v. Berryhill*, No. 1:16CV2414, 2017 U.S. Dist. LEXIS 129729, at *55 n.14 (N.D. Ohio July 24, 2017).

Despite Alexandrowski's emphasis on Dr. Gaudin's claimed role as a treating physician, a review of the records allegedly from that physician indicates that it was actually Nurse Practitioner Ovitt who saw and evaluated Alexandrowski, not Dr. Gaudin.  (Tr. 679 – 687).  I can find no records reflecting that Dr. Gaudin ever personally examined or treated the patient.  And the statement that Alexandrowski's radiculopathy likely would not improve was not made by Dr. Gaudin but by Nurse Practitioner Ovitt, and it was one sentence of an April 19, 2017 treatment note for the purpose of describing the prognosis of Alexandrowski's radiculopathy based on the EMG results.  (Tr. 677-80).  The April 19, 2017 treatment notes did not indicate whether Alexandrowski's radiculopathy impeded her activities of daily living or her ability to perform work-related tasks or specify what Alexandrowski *can* do in spite of her limitations.  20 C.F.R. § 416.927(a)(1).  Even reading Alexandrowski's argument as referring to the entirety of Nurse Practitioner Ovitt's April 19, 2017 treatment notes, Nurse Practitioner Ovitt did not opine on what functional limitations were attributable to Alexandrowski's physical impairments.  (Tr. 679-80).  And although Nurse Practitioner Ovitt discussed Alexandrowski's reported symptoms,

23

a narrative description of a claimant's subjective complaints does not constitute an opinion in a Social Security case. *McCready v. Comm'r of Soc. Sec.*, No. 10-13893, 2012 U.S. Dist. LEXIS 43551, at *23 (E.D. Mich. Mar. 2, 2012). Thus, I find Alexandrowski's entire argument concerning the ALJ's handling of the "opinion" of "Dr. Gaudin" to be unfounded.

As for Dr. Green, his July 23, 2014 special instructions that Alexandrowski avoid strenuous activity "at this time" were discharge instructions provided to Alexandrowski after she visited the emergency room for her workplace accident. (Tr. 551, 561). Alexandrowski seems to imply that this was a permanent restriction unless literally revoked at a later date by the physician. Given that the instruction followed her discharge from the emergency room and the instructions specified limitations applicable "at this time," allowed for gradual increase in activity, and instructed that she follow up in five days, that argument must be summarily rejected. *Holloway v. SSA*, No. 3:12-1111, 2015 U.S. Dist. LEXIS 84765, at *22-3 (M.D. Tenn. June 30, 2015) (finding the ALJ was justified in not analyzing discharge instructions as opinion evidence absent any indication that the instructions provided for permanent restrictions). Further, because Dr. Green's discharge instructions did not say what Alexandrowski *could* do in spite of her injury, they are not medical opinions under Social Security law. 20 C.F.R. § 416.927(a)(1).

Because Nurse Practitioner Ovitt's treatment notes and Dr. Green's July 24, 2014 discharge instructions were not medical opinions, neither was due *any* weight. *Soto v. Comm'r of Soc. Sec.*, No. 17-10054, 2018 U.S. Dist. LEXIS 50606, at *12 (E.D. Mich. Mar. 2, 2018) ("[T]he ALJ need not assign any weight to evidence that is not a medical opinion."). Alexandrowski cannot, therefore, establish that a remand is warranted based on any claimed

error in the ALJ's consideration of those records.  *Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009).

### 3.  Dr. Shamberg

When Dr. Shamberg rendered his opinions concerning Alexandrowski, he'd had a single interview with Alexandrowski and no prior treating relationship with her.  (Tr. 64-67, 615-622).  Thus, he was a consultative examiner to whose opinion the ALJ was not required to give controlling weight or articulate "good reasons" for not doing so.  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (holding that a clinical psychologist who examined the claimant only once, was paid by the Social Security Administration, and administered no treatment was not a treating source under the regulations); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006).  Dr. Shamberg's later treatment of Alexandrowski treatment does not change the consultative nature of his opinion.  *Witnick v. Colvin*, No. 14-cv-00257, 2015 U.S. Dist. LEXIS 19450, at *12 (N.D. Ohio Feb. 18, 2015) (finding visits subsequent to the issuance of the opinion "irrelevant" to the question of whether the physician was a treating physician "*at the time he rendered his opinion*" (emphasis in original) (quotation marks omitted)).

The ALJ was only required to state the weight assigned to Dr. Shamberg's opinion and evaluate it under the 20 C.F.R. § 416.927(c) factors.  20 C.F.R. § 416.927(f); SSR 96-6p, 1996 SSR LEXIS 3, at *5.  The ALJ complied with the former requirement by explaining that he assigned "some weight" to Dr. Shamberg's opinion.  (Tr. 27).  The ALJ arguably did not comply with the requirement to evaluate the opinion using the regulatory criteria.[5]  The ALJ's only stated reason for not fully crediting Dr. Shamberg's opinion was that he later treated Alexandrowski.  A

---

[5] The ALJ decision is silent on the extent to which the ALJ considered the applicable regulatory factors. It is certainly possible the ALJ did consider the applicable regulatory criteria; but one cannot be sure given the absence of discussion in the decision.

consultative examiner's potential conflict of interest could fall within "other factors," but it is unclear why a conflict of interest arising after issuance of an opinion would affect the validity of the pre-conflict opinion.  20 C.F.R. § 416.927(c)(6).

Nevertheless, an error in the ALJ's evaluation of a consultative examiner can be harmless, such as when the ALJ makes independent findings consistent with the opinion or when the decision is otherwise supported by substantial evidence.  *Dykes v. Barnhart*, 112 F. App'x 463, 468 (6th Cir. 2004); *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004); *Biddle v. Berryhill*, No. 3:17-CV-198, 2019 U.S. Dist. LEXIS 22268, at *16-17 (E.D. Tenn. Feb. 12, 2019).  The ALJ's RFC finding that Alexandrowski could not be exposed to hazards and was limited to simple, routine, and repetitive tasks at less than production rate pace was consistent with Dr. Shamberg's opinion that Alexandrowski had "severe significant limitations" staying focused, maintaining normal attention, keeping up pace, and persisting with job tasks.  (Tr. 24, 621).  The ALJ's finding that Alexandrowski was limited to a static work setting with infrequent changes conveyed orally or by way of short-form demonstration was consistent with Dr.

Shamberg's opinion that Alexandrowski would have "severe significant limitations" understanding, remembering, and executing written instructions.  (Tr. 24, 621).  And the ALJ's RFC finding that Alexandrowski could have no interaction with the general public, could only occasionally respond appropriately to interactions with supervisors and coworkers, and could not work in teams or in tandem with other workers was consistent with Dr. Shamberg's opinion that Alexandrowski had "severe significant limitations" in responding appropriately to interactions with supervisors and other workers and would "not do well" in social responsiveness.  (Tr. 24, 621).

Substantial evidence also supported the ALJ's decision not to incorporated greater restrictions into Alexandrowski's mental RFC, including: (1) Dr. Malloy's and Dr. Zeune's opinion that Alexandrowski was not significantly limited with simple instructions and her ability to maintain pace or make simple work-related decision and was only moderately limited in her ability to interact with supervisors and coworkers, work in coordination with others, work a normal workweek, and respond appropriately to workplace changes; (2) Dr. Kuna's opinion that Alexandrowski had no psychological condition as a result of her workplace accident and had exaggerated her negative psychological functioning; (3) mental health treatment notes indicating logical thought process, adequate attention and concentration, intact memory, and good judgment; (4) treatment notes from providers during the period under adjudication repeatedly documenting normal mood and affect, good judgment and insight, and normal memory; and (5) Alexandrowski's statements that she had no problems getting along with others or with authority figures, could follow written and spoken instructions "very well," and could handle changes in routine "good."  (Tr. 161, 177-78, 193-95, 304-06, 676, 680, 685, 785-86, 843-45, 859-61, 934).

Because the ALJ's mental RFC was consistent with Dr. Shamberg's opinion, Alexandrowski has failed to establish reversible error on account of any claimed ALJ error in the ALJ's evaluation of Dr. Shamberg's opinion.  *Wilson*, 378 F.3d at 547; *Biddle*, No. 3:17-CV-198, 2019 U.S. Dist. LEXIS 22268, at *16-17.  And because the ALJ mental RFC finding was reasonably drawn from the evidence in the record, it fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *see also O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477.  Thus, no remand is warranted based Alexandrowski's challenge to the ALJ's evaluation of the opinion evidence.

27

**C.      Step Four: Disregard of Evidence in Support of a Finding of Disability**

Alexandrowski argues that the ALJ disregarded evidence that would have supported a finding of disability. ECF Doc. 18 at 23-24.  Specifically, Alexandrowski states the ALJ mischaracterized the frequency of her visits to the University of Toledo Medical Center by suggesting only a single visit occurred and ignored Dr. Dozier's statement that a second opinion was necessary. *Id.*  Alexandrowski also appears to argue that the ALJ failed to account for the fact that her injuries/neurological symptoms were the result of her workplace accident.  *See* ECF Doc. 18 at 24 ("The ALJ errs by failing to account for evidence in the record tending to support disability, as well as a deeper, not fully understood neural etiology causing her symptoms in a non-ordinary way.").

The Commissioner responds that the ALJ discussed the forklift incident and her neurological symptoms, such that any argument about the etiology would be inconsequential. ECF Doc. 19 at 4.  Alexandrowski's reply does not further develop this issue.  *See generally* ECF Doc. 20.

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.  In making his RFC, the ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."  *Goble v. Astrue*, 385 F. App'x 588, 593 (7th Cir. 2010).

Aside from a one-sentence claim that the ALJ mischaracterized the frequency of her visits to the University of Toledo Medical Center and disregarded Dr. Dozier's statement that a second opinion was needed, Alexandrowski does not explain how or why the frequency of her visits or the need for a second opinion is relevant to whether she was disabled. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Alexandrowski's argument concerning the etiology of her neurological impairments, while considerably lengthier by comparison, does little, if anything, to convey to the court in what way the ALJ failed to account for the relationship between her workplace accident and her symptoms. ECF Doc. 18 at 24. It is not for the court to put flesh on the bones of counsel's skeletal arguments, nor is it the court's role to scour the record for what evidence may support counsel's argument. *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("Judges are not like pigs, hunting for truffles that might be buried in the record." (alteration and quotation marks omitted)); *McPherson*, 125 F.3d at 996; *Jones v. Comm'r of Soc. Sec.*, No. 3:12 CV 2986, 2013 U.S. Dist. LEXIS 126077, at *19 (N.D. Ohio July 30, 2013) ("[I]t is not the Court's function to search the … record for evidence to support Jones's 'argument' or find law supporting her claims."). Alexandrowski's challenge to the ALJ's consideration of the evidence could be disposed of on the basis of forfeiture alone.

Nevertheless, the ALJ applied proper legal standards by considering all of the evidence in making his findings of Alexandrowski's RFC. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Although the ALJ only mentioned one date (March 2017), the ALJ did not specify how many times Alexandrowski visited the University of Toledo Medical Center, nor indicate that she only went there once. The records show that Alexandrowski visited the University of Toledo Medical

Center four times, twice in March 2017, and once each in April 2017 and May 2017.  (Tr. 675-87).  The ALJ expressly cited and discussed the most recent of those visits.  (Tr. 26).  The ALJ also expressly discussed Dr. Dozier's April 17, 2018 treatment note and his finding that lumbar MRI scans did not account for the diffuse nature of Alexandrowski's symptoms, a finding confirmed in Dozier's August 2, 2018 treatment note – which Alexandrowski claims the ALJ disregarded.  (Tr. 26-27 (discussing (Tr. 894, 914)).  "There is no requirement[] that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record."  *Day v. Comm'r of Soc. Sec.*, No. 1:16-cv-2813, 2017 U.S. Dist. LEXIS 208434, at *37 (N.D. Ohio Dec. 5, 2017).  Thus, any alleged failure to discuss these particular records did not prejudice Alexandrowski.

As for the relationship between Alexandrowski's neurological symptoms and her workplace accident, the ALJ quoted Alexandrowski's statements to Dr. Shamberg claiming a direct and causal relationship between her workplace accident and her pain.  (Tr. 25) (quoting (Tr. 621)).  The also ALJ summarized treatment records documenting Alexandrowski's pain and neurological symptoms.  (Tr. 25-27).  Thus, the record establishes that the ALJ adequately considered the relationship between Alexandrowski's accident and her symptoms.

### D.      Step Five: Inaccurate Hypothetical to the VE

Alexandrowski makes a multifaceted argument that the ALJ erred by relying on the VE's responses to a hypothetical that did not include the full extent of her limitations.  ECF Doc. 18 at 25.  Specifically, she argues the hypothetical should have included periodic loss of function of the lower extremities and a sit/stand limitation.  ECF Doc. 18 at 25-26.  Alexandrowski also argues the ALJ's hypothetical failed to adequately address: (1) her "brain problems;" (2) "unlikely-to-resolve ongoing neurological issues with lower extremities;" (3) the combined

effect of her physical and emotional impairments; (4) fear of unexpected noises that would somehow be worsened by a limited neck range of motion; (5) a limited neck range of motion; (6) her gastrointestinal problems; and (7) complications from her medications. ECF Doc. 18 at 25-26.

The Commissioner responds that Alexandrowski waived any argument concerning the hypothetical's failure to include the above limitations because she failed to raise them on cross examination of the VE. ECF Doc. 19 at 5. The Commissioner further argues the ALJ's hypothetical did not need to include limitations the ALJ did not adopt. ECF Doc. 19 at 6. The Commissioner also argues that ALJ accounted for leg and neck limitations and mental health limitations in the RFC, and Alexandrowski failed cite evidence requiring a sit-stand option or additional limitations on account of her gastrointestinal problems. ECF Doc. 19 at 7-8.

In her reply brief, Alexandrowski distinguishes her cases from those cited by the Commissioner but does not otherwise develop her Step Five challenge. ECF Doc. 20 at 1.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 416.920(a)(4)(v). An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a VE's testimony that the claimant has the ability to perform specific jobs. *Howard*, 276 F.3d at 238. A VE's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC. *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a [VE] in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal

quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").

As an initial matter, the Commissioner overstates the scope of the "waiver"[6] doctrine at Step Five.  A counsel's failure to cross examine a VE forfeits any argument that there was a conflict between the VE's testimony and the *Dictionary of Occupational Titles* ("DOT") or that the VE's testimony was ambiguous.  *E.g.*, *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009); *Macphee v. Saul*, No. 1:19-cv-711, 2020 U.S. Dist. LEXIS 127341, at *20 (N.D. Ohio July 20, 2020); *Turner v. Comm'r of Soc. Sec.*, No. 2:19-cv-900, 2020 U.S. Dist. LEXIS 5169, at *10-11 (S.D. Ohio Jan. 13, 2020).  The forfeiture operates against a claim that the ALJ failed to resolve conflicts between the VE's testimony and the DOT and against a claim challenging the VE's testimony.  *Aiello v. Comm'r of Soc. Sec.*, No. 1:19-CV-01558, 2020 U.S. Dist. LEXIS 86498, at *6 (N.D. Ohio May 18, 2020).  It does not, as the Commissioner contends, forfeit *any* issue concerning an ALJ's hypothetical to the VE, and none of the cases the Commissioner cites support that proposition.  ECF Doc. 19 at 5 (citing *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006) (holding in the alternative that the claimant could not claim error on account of the ALJ's failure to establish the onset date when the claimant's counsel voluntarily ceased questioning the *medical expert* on the issue); *Baranich v. Barnhart*, 128 F. App'x 481, 489-90 (6th Cir. 2005) (saying nothing on the issue of forfeiture and instead concluding that the ALJ was not at fault for counsel's decision to cease questioning the VE); *Hare v. Comm'r of Soc. Sec.*, 37 F. App'x 773, 776-77 (6th Cir. 2002) (holding that the claimant

---

[6] Although the Commissioner refers to "waiver," "forfeiture" is the more apt term to refer to the effects of a claimant's failure to raise an issue before the ALJ.  *See United States v. Olano*, 507 U.S. 725, 733 (1993) (explaining that forfeiture is the failure to timely assert a right, whereas waiver is the intentional relinquishment of a known right).

forfeited any argument concerning ambiguities in the *VE*'s testimony of what the occupation of surveillance system monitor does by not asking VE about it on cross examination). The Commissioner has not shown the forfeiture doctrine operates against claims challenging the ALJ's hypothetical to the VE, as opposed to the VE's testimony in response. *See Willis v. Saul*, No. 2:20-cv-10304, 2021 U.S. Dist. LEXIS 47201, at *21 (E.D. Mich. Feb. 17, 2021) (concluding it doesn't).

Moving on to the merits, the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in determining that Alexandrowski was not disabled at Step Five. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Although not forfeited, Alexandrowski's Step Five challenge faces a different obstacle. The ALJ was only required to incorporate into the hypothetical those limitations he accepted as credible. *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007). The ALJ's hypothetical to the VE included all the limitations the ALJ found in his RFC determination. *Compare* (Tr. 84-85, 87), *with* (Tr. 24). Aside from her challenge to the ALJ's evaluation of the opinion evidence and consideration of the record, Alexandrowski has not challenged the ALJ's RFC findings. *See generally* ECF Doc. 18; ECF Doc. 20. Therefore, the ALJ's hypothetical accurately portrayed Alexandrowski's physical and mental limitations – as stated in the RFC – and the VE's testimony that there were a significant number of jobs in the national economy someone with those hypothetical capabilities and limitations could perform was substantial evidence that supported the ALJ's finding of no disability. *Griffeth*, 217 F. App'x at 429; *Howard*, 276 F.3d at 238; *see also Peacock v. Kijakazi*, No. 1:20-cv-01459, 2021 U.S. Dist. LEXIS 187652, at *25-26 (N.D. Ohio Sept. 30, 2021).

The above analysis notwithstanding, it is clear from a review of the briefs that Alexandrowski has conflated the ALJ's responsibilities at Step Four (to determine the claimant's

RFC) with those of Step Five (to determine whether the claimant could adjust to other work) and

has presented an argument to the latter, when she meant to contest the former.  20 C.F.R.

§ 416.920(a)(4)(iv)-(v); *see Antio v. Comm'r of Soc. Sec.*, No. 08-cv-14933, 2010 U.S. Dist.

LEXIS 20417, at *19 (E.D. Mich. Feb. 5, 2010).

Reframing Alexandrowski's arguments as challenging the ALJ's RFC, however, faces its

own obstacle; Alexandrowski claims functional limitations without meaningful argumentation as

to why they were warranted or why the ALJ's RFC hasn't already accounted for them.  ECF

Doc. 18 at 25-26.  She claims a limited neck range of motion but doesn't explain how that should

have translated to greater functional restrictions, what those limitations should have been, or how

a limited neck range of motion relates to her "fear of unexpected noises."  ECF Doc. 18 at 25.

She claims that something of Dr. Gaudin's (she doesn't say what) warranted a sit/stand option.

ECF Doc. 18 at 26 ("Dr. Gaudin's, *inter alia*, properly weighted, at least a sit/stand option and

timing should have been included." (omitted word(s) in original)).[7]  She claims gastrointestinal

problems and medication side effects without saying what those were or how they translated to

functional limitations.  ECF Doc. 18 at 26.  And she claims her neurological issues and the

combined effect of her physical and emotional impairments weren't adequately accounted for

without saying how or why.  ECF Doc. 18 at 25.  Alexandrowski's failure to meaningfully argue

her RFC challenge serves as an independent basis upon which the court may reject it.  *Emerson*,

446 F. App'x at 736; *McPherson*, 125 F.3d at 996.

Even assuming Alexandrowski had adequately challenged the ALJ's RFC findings, I

would nevertheless find that substantial evidence supports the ALJ's omission of a sit/stand

option or greater physical functional limitations.  Such evidence includes: (1) Dr. Hughes's and

---

[7] That argument seems far-fetched given my finding above that none of the records in the administrative record indicates that Dr. Gaudin ever saw the patient or made any findings of his own.

Dr. McKee's opinion that Alexandrowski could perform light work, including sit/stand for 6 hours, lift/carry 10 pounds frequently and 20 pounds occasionally, and had no manipulative or environmental limitations; (2) Dr. Wagner's opinion that Alexandrowski could sit normally for an 8-hour workday, had mild limitations with standing/walking and lifting/carrying weight, and had no manipulative or environmental limitations; (3) treatment notes through December 2018 noting no gastrointestinal symptoms; (4) normal objective exam findings through January 2019, including normal gait, strength, and range of motion and no acute distress; and (5) Alexandrowski's statement in her function report and testimony that she was able to get around by driving, which Dr. Wagner and Dr. Kuna noted as well.  (Tr. 49, 161, 175-76, 180, 191-92, 196, 303, 401, 668-69, 676-77, 679-80, 685-86, 783, 894, 904, 914, 933-34, 947-48). And, as discussed above, the ALJ's mental RFC was supported by substantial evidence.

Because the ALJ's RFC findings were reasonably drawn from the evidence in the record, they fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court.  *Mullen*, 800 F.2d at 545; *see also O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477.

### E.    Step Five: Inconsistency

Alexandrowski argues that the positions of merchandise maker, officer helper, and mail clerk did not adequately avoid the limitations resulting from her PTSD, and the VE did not testify which positions would not be in settings where her PTSD would be triggered.  ECF Doc. 18 at 26.  The Commissioner does not address this issue in its brief.  ECF Doc. 19 at 19.

Alexandrowski's last argument has not established a basis for remand.  If this argument is an extension of Alexandrowski's earlier argument that the functional limitations in the hypothetical were inaccurate, I have already found that argument to be unavailing because the claim was not well developed and the ALJ's RFC was supported by substantial evidence.  If

35

Alexandrowski is contesting the adequacy of the VE's testimony about the requirements of these positions, that issue is forfeited.  When, as here, the ALJ has inquired into whether the VE's testimony is consistent with the DOT and is given an affirmative response, the burden was on Alexandrowski to investigate the accuracy of the VE's testimony and raise any issues on cross examination at the ALJ hearing.  *Beinlich*, 345 F. App'x at 168; (Tr. 89).  Alexandrowski did not question the VE on the noise that a worker would be exposed to in the positions the VE testified the hypothetical individual could perform.  *See* (Tr. 90-97).  Thus, the VE's testimony that Alexandrowski could perform other work in the national economy, including merchandise marker, mail clerk, and office helper, was substantial evidence supporting a finding that she could perform other work.  (Tr. 86); *Louden v. Comm'r of Soc. Sec.*, 507 F. App'x 497, 499 (6th Cir. 2012).

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Alexandrowski's application for SSI be affirmed.

Dated: November 18, 2021

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).